James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BLUE GRASS TOBACCO COMPANY, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, AND KANSAS CITY SOUTHERN RAILWAY COMPANY,<br><br>Defendants. | Civil Action No.<br><br><br><br>**CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiff Blue Grass Tobacco Company ("Blue Grass" or "Plaintiff"), a New Jersey corporation located in Avon, New Jersey, individually and on behalf of a class of all those similarly situated, brings this action for damages under the antitrust laws of the United States against Defendants, and alleges as follows:

## NATURE OF THE ACTION

1.      This is an antitrust class action charging five United States based Class I railroads with price fixing in violation of Section 1 of the Sherman Act.  Plaintiff brings this action on behalf of itself and an alleged class of direct purchasers who purchased unregulated rail freight

transportation services from Defendants and their co-conspirators from July 1, 2003 to the present (the "Class Period," which will also include the period from the date of this filing to the date of class notice) and who were assessed a rail fuel surcharge for the agreed-upon transportation.  As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.  Defendants collectively control over 90 percent of the rail freight traffic in the United States.

2.     Plaintiff alleges that during the Class Period, defendant railroads conspired to fix, raise, maintain, or stabilize prices of rail freight transportation services sold in the United States through use of rail fuel surcharges added to customers' bills.  A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel.  Throughout the Class Period, Defendants maintained uniformity of prices in Rail Fuel Surcharges by computing the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices and trigger points for adjusting the percentages monthly.  Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

3.     As a direct and proximate result of this price fixing conspiracy, Defendants have restrained competition in the market for unregulated rail freight transportation services and injured plaintiff and each Class member in their business and property.  Plaintiff and the members of the Class each have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

4.     Plaintiff seeks damages on behalf of itself and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other

means exempt from rate regulation under federal law. Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

5.     Plaintiff Blue Grass Tobacco Company is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 307 Ocean Avenue, Avon, New Jersey 07717.

6.     During the class period, Blue Grass imported and distributed cigarettes.

7.     Blue Grass purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on plaintiff in connection with that unregulated rail freight transportation. The prices plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices plaintiff would have paid absent the conspiracy alleged herein. Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations. Plaintiff asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants imposed Rail Fuel Surcharges, during the Class Period.

8.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. In New Jersey, CSX maintains business offices at 1 Pennsylvania Ave, Kearny, New Jersey 07032. CSX also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City, Elizabeth, North Bergen, Kearny and Ridgefield, through which it originates and terminates rail traffic within this District. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets

in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States.

9. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. In New Jersey, NS maintains business offices at 125 County Road, Jersey City, New Jersey 07307. NS also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City and Elizabeth through which NS originates and terminates rail traffic within the District. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

10. Defendants CSX and NS jointly own Conrail, which acts as a switching carrier for CSX and NS and operates almost 200 miles of rail lines in the northern half of New Jersey. The hub of Conrail activities in the region is Oak Island Yard in Newark, with smaller local serving yards in Bayonne, Greenville (Jersey City), Linden, Manville, Metuchen, Old Bridge, Port Reading (Woodbridge), Red Bank, and Newark.

11. Together, CSX and NS move all rail traffic into and out of the New Jersey/New York area. The vast majority of that traffic originates or terminates within northern New Jersey, and in the environs of Newark. For example, each year CSX and NS handle to and from the Newark area tens of thousands of carloads of various commodities, such as chemicals, and merchandise freight. Additionally, with respect to container (or "intermodal") traffic, in 2006 CSX and NS handled 339,000 containers at ExpressRail, the on-dock rail facilities in Newark. CSX and NS also handled an additional 100,000 plus containers moving in domestic service through other rail terminals in the Newark area.

12.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  In New Jersey, BNSF's wholly-owned subsidiary, BNSF Logistics, LLC, maintains business offices at 375 N. Main Street, Suite C-1, Williamstown, New Jersey 08094.  BNSF also originates and terminates rail traffic within the District by providing transportation in interchange service with CSX and NS.  BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation.  BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

13.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  In New Jersey, UP maintains at least one employee or agent, though the business address is currently unknown.  UP also originates and terminates rail traffic within this District by providing transportation in interchange service with CSX and NS.  UP is the largest freight railroad in the United States.  UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including New Jersey).

14.     Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105.  In New Jersey, KCS maintains business offices at 1 Executive, Somerset, New Jersey 08873.  It also originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. KCS operates a major freight railroad in ten central and southeastern states.

## JURISDICTION AND VENUE

15.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15 , to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391.  Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

18.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of  itself and others similarly situated.  The "Class" is defined as:

> All purchasers of rail freight transportation services from Defendants (the "Class"), through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates

of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint.

20.     The Class is so numerous that joinder of all members is impracticable.  Given the magnitude of the commerce involved, the members of the Class are geographically dispersed, and joinder of all class members would be impracticable.  While the exact number of Class members is unknown to plaintiff at this time, plaintiff believes that there are, at a minimum, thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

21.     Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the restraint of trade alleged herein.  Plaintiff and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

23.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.     Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services  purchased by the Class;

  b. Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

  c. Whether Defendants' conduct violated the federal antitrust laws; and

  d. Whether Defendants' conduct caused injury to the business and property of plaintiff and the Class and, if so, the proper measure of damages.

24. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

25. The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

26. During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The US market for rail transportation services is estimated at more than $51 billion in 2006.

27.     The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce.  During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States.  Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

28.      The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

29.     Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980.  This landmark legislation marked a dramatic change in the evolution of U.S. railroads.  After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

30.     Prior to the Staggers Act, the Interstate Commerce Commission ("ICC") prohibited railroads from charging rates different from those contained in published tariffs filed by the railroads with the ICC.  Today, however, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

31.     Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities).  Five of these railroads -- the Defendants in this case -- operate more than 90 percent of all railroad track in the U.S. and account for more than $51 billion in total revenue.

32.     Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, tight capacity, and coordinated pricing.  Although the reason for deregulation of the railroad industry was to promote

competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

33.     The railroad industry today does not behave like a competitive market at all. Instead, it is dominated by the Defendants in this case. As one prominent railroad economist put it: "[R]ates charged shippers are surging and bottom lines are growing as if on steroids." Frank N. Wilner, *A Tale of Two (Railroad) Stories*, 72 JOURNAL OF TRANSPORTATION LAW, LOGISTICS AND POLICY 235, 238 (2005).

## THE RAILROADS INTRODUCE FUEL SURCHARGES

34.     By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe (BNSF) and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, put a moratorium on new mergers and then promulgated more stringent standards for merger review. Railroads were experiencing surging freight demand and tight capacity. In this environment, the railroads faced a stark choice: build new rail capacity to meet growing demand, or squeeze more revenue out of shippers using existing capacity. The railroads chose the latter course and seized on the rail fuel surcharge as the means to implement their price fixing conspiracy.

35.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation. In fourth quarter 2002, the AAR -- which is controlled by the major Class I railroads -- published, for the first time, a RCAF without fuel (i.e., a cost escalation index without fuel as a component). This was not done by accident or mistake. It was a conscious decision made by the AAR to remove fuel

costs from the RCAF index so that Defendants, which controlled the AAR, could begin assessing separate Rail Fuel Surcharges and coordinating that practice.

36.　　Predictably, that is what happened.  Following publication of the "RCAF index without fuel," Defendants seized the opportunity and began to apply a Rail Fuel Surcharge as a separate item on the shipper's bill.  When the price of oil began to rise dramatically in late 2003 and early 2004, Defendants began to see that they could use monthly changes to the fuel surcharge as an easy way to dramatically increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line to meet growing demand – so long as all the Defendants participated and did not undercut each other.

### DEFENDANTS' PRICE FIXING CONSPIRACY

37.　　Commencing in or about July 2003 or earlier, Defendants agreed to stop competing with one another with respect to prices they charged rail shippers and customers for carload shipments.  The key element of this price fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from rail shippers and customers. Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (*i.e.*, revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

38.　　Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs.  Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

39.　　Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge

percentages on their websites. They did so for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels.

40.     As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels throughout the Class Period.

41.     On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

42.     The STB also found that the railroads had been "double dipping" – applying to the same traffic both a fuel surcharge and a rate increase that is based on the RCAF or other index that includes a fuel cost component. The STB ordered Defendants to change these practices. The STB's decision addressed rate regulated rail freight traffic only (which is not the subject of this Complaint). The STB stated that its decision does not apply to rail freight traffic under contract or otherwise exempted from rate regulation.

43.     Defendants applied the same unreasonable fuel surcharge practices to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

### ELEMENTS OF THE PRICE FIXING CONSPIRACY

44.     The essential element of Defendants' conspiracy was an agreement to compute Rail Fuel Surcharges not as a cost recovery mechanism for the specific transportation to which it was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation

involved. Defendants applied these surcharges not only to published tariff rates, but to private contracts, and other traffic, not subject to rate regulation under federal law (i.e., the unregulated rates at issue here).

45. Defendants began to implement their conspiracy at least as early as June 2003 when the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices relative to Rail Fuel Surcharges. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index. The BNSF carload fuel surcharge was based on the US Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF"). In or about June 2003, however, the UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the class period.

46. The Western Railroads agreed to administer the HDF index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, the Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

47. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the

month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

48. The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF average price had changed. The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

49. Using the HDF index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

50. The chart below shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the class period began, but were identical starting in July 2003:

### MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
|-------|------|----|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |

| MONTH | BNSF | UP |
|-------|------|-----|
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |

51.     Defendants CSX and NS, located in the east, began to implement the conspiracy in February 2004 or earlier, and KCS, located in the Midwest, agreed to join the conspiracy in June 2005 or earlier.  (Defendants CSX, NS and KCS collectively are the "Eastern Railroads").  The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of

West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal*.  Indeed, not only did these railroads all agree to use the WTI index (as opposed to many other available indices); once they had joined the conspiracy, they too agreed to administer the index in precisely the same way.

52.     Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel.  When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel.  So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent.  The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

53.     The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted, thereby adopting fuel surcharge price timing used by the Western Railroads.  For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, Defendants could apply exactly the same fuel surcharge percentage month after month.  The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

54.     The choice to use the WTI index for fuel surcharges was arbitrary.  Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed.  The fact that Defendants CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior.  The similarities are too precise and too comprehensive to have been arrived at independently.

55. The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period. Although KCS used different fuel surcharge percentages for certain months of the Class Period, in June 2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lock step with them for the remainder of the Class Period. KCS has different operations and fuel consumption patterns from the larger US railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages as the other railroads absent a conspiracy.

56. The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the class period, but were identical starting in February 2004, and they also were identical to those of the KCS starting in June 2005, when the KCS joined the conspiracy:

## MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS | KCS |
|-------|-----|-----|-----|
| Jun-03 | 2.4% | 2% | |
| Jul-03 | 2.4% | 2% | |
| Aug-03 | 3.2% | 2% | |
| Sep-03 | 3.2% | 2% | |
| Oct-03 | 3.6% | 2% | |
| Nov-03 | 2.4% | 2.0% | |
| Dec-03 | 3.2% | 2.0% | |
| Jan-04 | 3.6% | 2.0% | |
| Feb-04 | 4.0% | 2% | |
| **Mar-04** | **4.8%** | **4.8%** | |
| Apr-04 | 4.8% | 4.8% | |
| May-04 | 5.6% | 5.6% | |
| Jun-04 | 5.6% | 5.6% | |
| Jul-04 | 7.2% | 7.2% | |
| Aug-04 | 6.4% | 6.4% | |
| Sep-04 | 7.2% | 7.2% | |
| Oct-04 | 8.8% | 8.8% | |
| Nov-04 | 9.2% | 9.2% | |
| Dec-04 | 12.4% | 12.4% | 10.0% |
| Jan-05 | 10.4% | 10.4% | 10.0% |
| Feb-05 | 8.4% | 8.4% | 10.0% |
| Mar-05 | 9.6% | 9.6% | 10.0% |
| Apr-05 | 10.0% | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% | 10.0% |

| MONTH | CSX | NS | KCS |
|-------|-----|-----|-----|
| **Jun-05** | **12.4%** | **12.4%** | **12.4%** |
| Jul-05 | 10.8% | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% | 12.8% |

57.     In stark contrast to this uniformity in fuel surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

**ADDITIONAL EVIDENCE OF A CONSPIRACY**

58.     Apart from this direct evidence of price fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation

industry is marked by certain structural and other characteristics that make a price fixing cartel feasible:

a.     The railroad industry is highly concentrated.  Defendants in this case are the <u>five</u> remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic.  Such high concentration facilitates the possibility of a price fixing cartel.

b.     There are significant barriers to entry into the railroad industry.  To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These take decades to develop, and require onerous regulatory and environmental reviews and approval.  Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power.  Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers.  Entry also requires that a new entrant capture a significant market share from existing carriers.  Entry is thus both expensive and risky.

c.     Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized.  Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications.  It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

d.     The railroad industry has a history of price fixing and other anti-competitive behavior.  In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must price fix

or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e. The CEO's of Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies).[1] The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

59. Apart from these structural market features, Defendants did not behave as if they were in a competitive market. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

60. Several national shipper organizations in fact met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only the BNSF agreed to make responsive changes to its surcharge program, and that

---

[1] A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) CSX; (3) Grand Trunk Corporation; (4) KCS; (5) NS; (6) Soo Line Railroad Co.; and (7) UP. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. The other Defendants refused to address the concerns of their customers.

61. At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

62. Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an inference of price fixing.

63. Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

64. Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant.

The fact that market shares did not did not fluctuate significantly during the Class Period is further indication that Defendants agreed to price fix rather than to compete for new sales.

## DEFENDANTS PROFITED FROM THE SURCHARGES

65.    Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied.  But since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure.  By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

66.    Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge.  Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

67.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a.    The Rail Fuel Surcharges charged to plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation;  and

    c.    competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

68.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by the plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation Of § 1 Of The Sherman Act And § 4 Of The Clayton Act)

69.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

70.    Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

71.    The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

72.     Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

73.     The contract, combination or conspiracy has had the following effects:

a.      Prices charged to plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

b.      Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c.      competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

74.     As a proximate result of Defendants' unlawful conduct, plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1)     That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff be denominated as class representative, and that plaintiff's counsel be appointed as counsel for the Class;

(2)     That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3)     That plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of plaintiff and each and every member of the Class;

(4)     That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5)     That plaintiff and the Class recover treble damages, as provided by law;

(6)     That plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(7)     For such further relief as the Court may deem just and proper.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff

By:   /s/ James E. Cecchi
        JAMES E. CECCHI

Dated:  June 29, 2007

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial as to all issues triable by a jury.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff

By:    /s/ James E. Cecchi
       JAMES E. CECCHI

Dated: June 29, 2007

## CERTIFICATION

Counsel for Plaintiff hereby certifies that, to the best of their knowledge, the following civil actions are pending in this District related to the subject matter hereof: *Dust Pro v. CSX Transportation, Inc., et al.*, Civil Action No. 07-2251(DMC); *Issac Industries. Inc. v. CSX Transportation. Inc., et al.*, Civil Action No. 07-2289 (DMC); *Bar-Ale. Inc. v. CSX Transportation, Inc., et al.*, Civil Action No. 07-02769 (DMC); *United Co-Operative Farmers, Inc., v. CSX Transportation, Inc., et al.*, Civil Action No. 07-2832 (DMC) and *Carter Distributing Company v. CSX Transportation Inc., et al.* filed on June 28, 2007, and that the following civil actions are pending in other Districts related to the subject matter hereof: *Dad's Products Company, Inc., v. BNSF Railway Company, et al.*, Civil Action No. 07-2954(SDY); *Zinafex Taylor Chemicals, Inc. v. CSX Transportation, et al.*, Civil Action No. 07-3274 (JFH), all in the Northern District of Illinois; *Dakota Granite Co. v. Association of American Railroads, et al.*, Civil Action No. 07-1101(RMC); *McIntyre Group Ltd. v. Association of American Railroads, et al.*, Civil Action No. 07-1078 (RMC); *GVL Pipe & Demolition, Inc. v. Association of American Railroads, et al.*, Civil Action No. 07-1119(RMC); *Ferraro Foods of North Carolina, LLC v. Association of American Railroads, et al.*,

Civil Action No. 07-1121(RMC); *Sublette Cooperative, Inc. v. Association of American Railroads, et al.*, Civil Action No. 1126(RMC); *Strates Shows, Inc. v. Association of American Railroads, et al.*, Civil Action No. 07-1127(RMC), all in the District of District of Columbia; and *Cedar Farms Co, Inc. v. CSX Transportation, Inc., et al.*, Civil Action No. 07-557(TJC) in the Middle District of Florida.

<div style="margin-left:40%">

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff


By:    /s/ James E. Cecchi
        JAMES E. CECCHI

</div>

Dated:  June 29, 2007